**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JONATHAN M. MILLER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:18-cv-01542- |
| v. | ) ) ) | **CLASS ACTION** |
| THE FINISH LINE, INC., GLENN S. LYON, TORRENCE BOONE, WILLIAM P. CARMICHAEL, RICHARD P. CRYSTAL, FAISAL MASUD, STEPHEN GOLDSMITH, CATHERINE A. LANGHAM, and SAMUEL M. SATO, | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | | |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Jonathan M. Miller ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.       Plaintiff brings this class action on behalf of the public stockholders of The Finish Line, Inc. ("Finish Line" or the "Company") against Finish Line and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Finish Line will be acquired by JD

Sports Fashion Plc ("JD Sports") through JD Sports' wholly-owned subsidiary Genesis Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On March 26, 2018, Finish Line issued a press release announcing it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with JD Sports, pursuant to which each of the Company's issued and outstanding Class A common shares will be converted into the right to receive $13.50 in cash (the "Merger Consideration"). The Proposed Transaction is valued at approximately $558 million.

3.      On May 7, 2018, Finish Line filed a Definitive Proxy Statement on FORM DEFM14A (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that Finish Line's stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Finish Line's financial projections, including the financial projections relied upon by Finish Line's financial advisors, PJ Solomon Securities, LLC ("PJ Solomon") and Houlihan Lokey Capital, Inc. ("Houlihan"); (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by PJ Solomon and Houlihan; and (iii) potential conflicts of interest. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Finish Line's stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

4.      In short, unless remedied, Finish Line's stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Finish Line is headquartered and incorporated in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

**PARTIES**

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Finish Line common stock.

9.      Finish Line is an Indiana corporation and maintains its principal executive offices at 3308 North Mitthoeffer Road, Indianapolis, Indiana 46235.  Finish Line is a retailer of athletic shoes, apparel and accessories.  The Company's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "FINL."

10.     Defendant Glenn S. Lyon ("Lyon") has been Chairman of the Board since July 2010 and a director of the Company since January 2009.  Defendant Lyon previously served as

Chief Executive Officer ("CEO") of the Company from December 2008 to February 2016, President of the Company from October 2003 to December 2008, Executive Vice President of the Company from September 2001 to October 2003, and Executive Chairman of the Company from February to September 2016.

11.     Defendant Torrence Boone ("Boone") has been a director of the Company since August 2011.

12.     Defendant William P. Carmichael ("Carmichael") has been a director of the Company since July 2003.

13.     Defendant Richard P. Crystal ("Crystal") has been a director of the Company since October 2009.

14.     Defendant Faisal Masud ("Masud") has been a director of the Company since September 2017.

15.     Defendant Stephen Goldsmith ("Goldsmith") has been a director of the Company since July 1999.

16.     Defendant Catherine. A. Langham ("Langham") has been a director of the Company since April 2006.

17.     Defendant Samuel M. Sato ("Sato") has been CEO of the Company since February 2016 and a director of the Company since October 2014.  Defendant Sato previously served as President of the Company from October 2014 to February 2016.

18.     Defendants Lyon, Boone, Carmichael, Crystal, Masud, Goldsmith, Langham and Sato are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

19.     JD Sports is a leading multichannel retailer of sports fashion and outdoor brands

in the U.K. and Europe.  JD Sports is incorporated under the laws of England and Wales and its registered office is located at Hollinsbrook Way, Pilsworth, Bury, Lancashire, BL9 8RR, United Kingdom.

20.     Merger Sub is an Indiana corporation and an indirect wholly-owned subsidiary of JD Sports.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Finish Line common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.  The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of March 23, 2018, there were approximately 41,298,819 Company common shares outstanding.  All members of the Class may be identified from records maintained by Finish Line or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

23.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

24.      Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

25.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

26.      Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

27.      Finish Line is a retailer of athletic shoes, apparel and accessories.  As of May 3, 2018, the Company operated 555 Finish line stores in 44 U.S. states and Puerto Rico.  Under the Finish Line brand, the Company is the exclusive retailer of athletic shoes, both in-store and online, for Macy's Retail Holdings, Inc., Macy's Puerto Rico, Inc. and Macys.com, Inc. (collectively, "Macy's").  The Company is responsible for the athletic footwear assortment, inventory, fulfillment, and pricing at all of Macy's locations and online at www.macys.com.  Finish Line's shops within department stores carry men's, women's and kids' athletic shoes, offering brand names such as Nike, Skechers, Converse, and Puma, among others.

28.     Finish Line's operating strategy includes an emphasis on customer service and providing convenient mall-based locations, as well as product diversity to attract core customers.

29.     The Company's growth plan proved to be successful in the Company's third quarter of fiscal year 2018.  On December 21, 2017, the Company announced its financial results for the third quarter, which included consolidated net sales of $378.5 million, a 1.8% increase compared to the third quarter of fiscal year 2017, comparable store sales increased 0.8% compared to the third quarter of fiscal year 2017, and Macy's sales increased 2.3% compared to the third quarter of fiscal year 2017.  Defendant Sato commented on the results, stating:

> We finished the third quarter ahead of expectations despite a highly promotional environment for athletic footwear. . . . The growth initiatives that we've put in place are driving increased traffic to our brand and helping increase conversion. While we responded to certain pricing actions in the marketplace to be competitive, we delivered gross margin in line with forecasts, and remained highly disciplined in managing expenses and inventories. Looking ahead, we continue to be cautious in the near-term, but I am confident that the work we are doing to position the company for long-term growth and enhanced profitability is gaining traction.

30.     The Company faced headwinds in the fourth quarter of fiscal year 2018 due to a difficult selling environment for athletic footwear.  Despite these challenges, as set forth in the March 29, 2018 press release announcing the fourth quarter and fiscal 2018 full year financial results, Finish Line Macy's sales increased 8.5% compared to the fourth quarter of fiscal 2017. Defendant Sato also highlighted that the Company "deliver[ed] adjusted earnings per share for the fourth quarter at the high-end of our most recent guidance range of $0.58 to $0.59."

**The Sales Process**

31.     Over the past several years, the Board and Finish Line management have reviewed and assessed the Company's long-term strategic goals and opportunities, competitive environment, and short- and long-term performance in light of its strategic plan.

32.     In August of 2016, defendant Sato briefly met with the Executive Chairman of JD

Sports, Peter Cowgill ("Cowgill") and discussed potential consideration of a future strategic discussion.

33.    On April 14, 2017, Sports Direct International plc ("Sports Direct") filed a Schedule 13D with the SEC reporting an economic interest representing approximately 7.9% of the Company's outstanding shares resulting from the acquisition of derivative securities called contracts for differences ("CFDs").

34.    On April 20, 2017, Sports Direct's chief executive, Mike Ashley ("Ashley"), met with defendant Sato, the Company's Chief Financial Officer, Ed Wilhelm, and Finish Line's General Counsel, Chris Eck ("Eck").   At the meeting, Ashley raised the possibility of a collaboration between the two companies in the U.S. and the U.K.  Ashley further indicated that Sports Direct had no interest in acquiring Finish Line and did not seek representation on the Board. Following the meeting, Sports Direct gradually increased its economic exposure to the Company's common shares through additional CFDs.[1]

35.    Then, in late May 2017, Cowgill contacted defendant Sato and suggested JD Sports and Finish Line initiate a formal dialogue with respect to a potential collaboration or business combination.  The two parties subsequently entered into a mutual confidentiality and standstill agreement on July 27, 2017, and JD Sports conducted due diligence on Finish Line.

36.    On September 28, 2017, the Board established a special committee (the "Special Committee") composed of defendants Carmichael, Crystal, Goldsmith, and Langham.  Finish Line

_____

[1] On May 5, 2017, Sports Direct filed an amendment to its Schedule 13D indicating it had an economic interest representing approximately 13.6% of Finish Line's common shares.  On August 21, 2017, Sports Direct acquired direct ownership for the first time, including voting and disposition power, of approximately 7.91% of the Company's outstanding shares.  By August 22, 2017, Sports Direct reported it had increased its economic interest through CFDs to approximately 29.6% of the Company's outstanding common shares and further increased its economic interest to 31.8% of the Company's outstanding common shares by February 21, 2018.

later engaged PJ Solomon to act as financial adviser to the Special Committee in connection with various strategic alternatives, including a potential sale of Finish Line, and Houlihan to provide a fairness opinion in connection with a potential transaction.

37.     Thereafter, on October 16, 2017, JD Sports sent a preliminary indication of interest to acquire Finish Line at a price of $13.00 to $14.50 per share.  The indication of interest also requested a seven-week period of exclusivity.

38.     On October 18, 2017, a representative of Sports Direct sent Eck an email reiterating Sports Direct's desire to engage in discussions with Finish Line regarding a potential commercial relationship.  Also during this time, Sports Direct and Finish Line's representatives engaged in discussions whether Sports Direct was exempted from a rights plan the Board approved on August 25, 2017 or whether its short put option positions were "grandfathered."  The parties were unable to come to a resolution and beginning on October 25, 2017, Sports Direct threatened to file suit in Indiana and seek a declaratory judgment if its positions were not accepted by Finish Line.

39.     On October 30, 2017, Finish Line and JD Sports entered into an exclusivity agreement, providing JD Sports with a period of exclusive negotiation rights, which period expired on December 14, 2017 and was not extended.

40.     On February 16, 2018, JD Sports submitted a revised indication of interest to acquire Finish Line for $11.50 per share.  Finish Line and JD Sports subsequently agreed to a price of $13.50 per share on March 19, 2018 and negotiated the remaining terms of the deal.

41.     At a March 25, 2018 joint meeting of the Board and Special Committee, PJ Solomon and Houlihan each rendered their fairness opinion.  Thereafter, following the recommendation of the Special Committee, the Board approved the Merger Agreement, which the

parties executed the next day.

**The Proposed Transaction**

42.    On March 26, 2018, Finish Line issued a press release announcing the Proposed

Transaction.  The press release stated, in relevant part:

> INDIANAPOLIS--Mar. 26, 2018-- Athletic retailer The Finish Line, Inc. (NASDAQ:FINL) announced today that it has entered into a merger agreement providing for JD Sports Fashion Plc (LSE: JD) to acquire 100% of the issued and outstanding Finish Line shares at a price of $13.50 per share in cash representing an aggregate deal value of approximately $558 million. JD is the leading European retailer of sports, fashion and outdoor brands.

> "The Special Committee appointed by the Finish Line board recommended and the board voted unanimously to approve entering into this merger agreement," said Bill Carmichael, Chairman of the Special Committee and Lead Director of the Finish Line Board of Directors. "With JD, Finish Line achieves immediate value for its shareholders and moves into a stronger position to compete as part of a global enterprise that leads in our industry."

> "Finish Line has long admired JD and their commitment to serve customers with premium brands through a unique and innovative retail experience," said Sam Sato, Chief Executive Officer of Finish Line. "We are thrilled to partner with them and look forward to realizing the impact we will have on the marketplace together."

> "We are extremely excited to be joining up with Finish Line, a well-established US operator," said Peter Cowgill, Executive Chairman of JD. "The acquisition represents an excellent opportunity for JD to establish its market leading multi-brand proposition in the world's largest athleisure market. It immediately offers a major presence in the US, a clear next step to further increase our global scale. Finish Line has many similarities to JD with a strong bricks and mortar offering complemented by an advanced and well-invested digital platform. We are looking forward to working with Finish Line's experienced management team to bring best in class retail theatre to the US. Our combined extensive knowledge of the retail market and our product and marketing relationships with global brand partners will benefit our customers, in turn supporting the continued future growth of JD."

> **Transaction Highlights**

> - The terms of the merger represent a premium of 28 percent for Finish Line shareholders compared to the closing price of Finish Line's shares of $10.55 as of March 23, 2018.

- This provides an excellent strategic fit for Finish Line and JD. Finish Line moves into a stronger position to compete as part of a global enterprise that leads in the industry. JD gains a significant physical and online retail presence with direct access in the US which they have long identified as a highly attractive growth opportunity.

- Finish Line and JD together create a leading global, premium, multichannel retailer of sports, fashion and outdoor brands who embraces the latest online and in-store digital technology.

- The combined purchasing power of Finish Line and JD, coupled with the strategic alignment with major international sportswear brands in North America, is expected, on completion, to enable the enlarged group to bring a highly differentiated multi-channel retail proposition to the US market.

- Upon closing of the agreement, the Finish Line executive team will continue their involvement with the business.

The merger agreement is subject to Finish Line and JD shareholder approval of the merger, the receipt of all required regulatory approvals, and the satisfaction of other customary conditions to closing. The expected timeline to close on this agreement is no earlier than June 2018.

**Insiders' Interests in the Proposed Transaction**

43.     JD Sports and Finish Line insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Finish Line.

44.     Notably, it appears that certain members of Company management are securing positions for themselves upon consummation of the Proposed Transaction.  According to the Proxy Statement:

> JD Sports and Finish Line have commenced an integration planning process to determine the employment status of Finish Line's executive officers following the effective time of the merger. Additional decisions regarding the employment status of Finish Line's executive officers are expected to be made closer to, or after, the closing of the merger. As a result, at this time the current employment agreements with Mr. Sato, Mr. Wilhelm, Ms. Greenwell, Mr. Hall, and Mr. Sutera are expected to remain in effect unless and until terminated or amended in connection with the integration planning process with JD Sports.

Proxy Statement at 70.  Moreover, in the March 26, 2018 press release announcing the Proposed Transaction, Cowgill states, "We are looking forward to working with Finish Line's experienced management team to bring best in class retail theatre to the US."

45.    Finish Line insiders stand to reap substantial financial benefits for securing the deal with JD Sports.  Under the terms of the Company's long-term incentive bonus programs for each of fiscal year 2017 and fiscal year 2018, each of Finish Line's executive officers will receive an acceleration of their bonus awards upon consummation of the Proposed Transaction.   The following table sets forth the bonus awards the Company's executive officers stand to receive:

| Executive Officer | Fiscal Year 2017 Bonus Program Award | Fiscal Year 2018 Bonus Program Award |
|---|---|---|
| Samuel M. Sato | $162,500 | $250,000 |
| Edward W. Wilhelm | $97,500 | $150,000 |
| Melissa Greenwell | $97,500 | $150,000 |
| John Hall | $92,083 | $150,000 |
| AJ Sutera | $97,500 | $150,000 |

AJ Sutera stands to receive additional cash bonus awards in connection with the Proposed Transaction in the aggregate amount of $1,000,000, which the Company granted to him on September 1, 2017.

46.    Moreover, if they are terminated in connection with the Proposed Transaction, Finish Line's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation, as set forth in the following table:

| Executive | Cash ($) | Equity (1) ($) | Perquisites/ Benefits (2) ($) | Total ($) |
|---|---|---|---|---|

| Samuel M. Sato | $ 6,187,500 (3) | $ 3,436,722(8) | $ 32,404 | $ 9,656,626 |
| Melissa A. Greenwell | $ 2,216,250 (4) | $ 550,044(9) | $ 23,789 | $ 2,790,083 |
| Edward W. Wilhelm | $ 2,566,250 (5) | $ 657,456 (10) | $ 32,404 | $ 3,256,110 |
| John J. Hall | $ 3,020,208 (6) | $ 822,407 (11) | $ 32,404 | $ 3,875,019 |
| AJ Sutera | $ 3,106,875 (7) | $ 519,480 (12) | $ 32,404 | $ 3,658,759 |

## The Proxy Statement Contains Material Misstatements and Omissions

47.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Finish Line's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction.

48.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Finish Line's financial projections, relied upon by Finish Line's financial advisors PJ Solomon and Houlihan; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by PJ Solomon and Houlihan; and (iii) potential conflicts of interest.  Accordingly, Finish Line stockholders are being asked to make a voting decision in connection with the Proposed Transaction without all material information at their disposal.

### *Material Omissions Concerning Finish Line's Financial Projections*

49.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

50.    The Proxy Statement omits material information regarding Finish Line management's financial projections and the financial analyses performed by the Company's financial advisors PJ Solomon and Houlihan.

51.    For example, in connection with PJ Solomon's *Illustrative Discounted Cash Flow*

*Analysis* ("DCF"), the Proxy Statement sets forth:

> PJ SOLOMON performed an illustrative discounted cash flow analysis of Finish
> Line using Finish Line's financial forecasts for the period beginning on March 1,
> 2018 through the fiscal year ending February 28, 2021 and other information and
> data provided by Finish Line's management to calculate the present value of the
> estimated unlevered after-tax free cash flows projected to be generated by Finish
> Line.

Proxy Statement at 52. Additionally, in connection with Houlihan's DCF, the Proxy Statement

states, "Houlihan Lokey performed a discounted cash flow analysis of Finish Line by calculating

the estimated net present value of the projected unlevered, after-tax free cash flows of Finish Line

based on the Finish Line projections." The Proxy Statement fails, however, to disclose the

Company's unlevered, after-tax free cash flows and line items utilized to calculate the Company's

unlevered, after-tax free cash flows that were taken into account in both PJ Solomon and

Houlihan's DCFs, including tax rate and depreciation and amortization.

52.     The omission of this information renders the statements in the "Certain Projected

Financial Information" and "Opinions of the Finish Line Special Committee's Financial

Advisors," sections of the Proxy Statement false and/or materially misleading in contravention of

the Exchange Act.

***Material Omissions Concerning PJ Solomon and Houlihan's Financial Analyses***

53.     The Proxy Statement describes PJ Solomon and Houlihan's fairness opinions and

the various valuation analyses performed in support of their opinions. However, the description

of PJ Solomon and Houlihan's fairness opinions and analyses fails to include key inputs and

assumptions underlying these analyses. Without this information, as described below, Finish

Line's public stockholders are unable to fully understand these analyses and, thus, are unable to

determine what weight, if any, to place on PJ Solomon and Houlihan's fairness opinions in

determining whether to vote in favor of the Proposed Transaction. This omitted information, if

disclosed, would significantly alter the total mix of information available to Finish Line's stockholders.

54.    With respect to PJ Solomon's *Analysis of Selected Publicly Traded Companies*, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the selected comparable companies observed by PJ Solomon in the analysis; and (ii) any benchmarking analyses for Finish Line in relation to the selected companies analyzed by PJ Solomon.

55.    With respect to PJ Solomon's *Analysis of Selected Precedent Transactions*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each of the selected transactions analyzed by PJ Solomon in the analysis

56.    With respect to PJ Solomon's DCF, the Proxy Statement fails to disclose: (i) Finish Line's estimated unlevered after-tax free cash flows; and (ii) the inputs and assumptions underlying the discount rates ranging from 11.0% to 13.0%, used in the analysis.

57.    With respect to Houlihan's *Selected Companies Analysis*, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the selected comparable companies observed by Houlihan in the analysis; and (ii) any benchmarking analyses for Finish Line in relation to the selected companies analyzed by Houlihan.

58.    With respect to Houlihan's DCF, the Proxy Statement fails to disclose: (i) Finish Line's estimated unlevered after-tax free cash flows; and (ii) the inputs and assumptions underlying the discount rates ranging from 10.0% to 12.0%, used in the analysis.

59.    When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

60.     The omission of this information renders the statements in the "Opinions of the Finish Line Special Committee's Financial Advisors" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Potential Conflicts of Interest***

61.     The Proxy Statement omits material information relating to potential conflicts of interest faced by the Company's financial advisor, Houlihan.

62.     The Proxy Statement sets forth that:

> Houlihan Lokey and certain of its affiliates have in the past provided financial advisory and/or other financial or consulting services to Finish Line and an affiliate of JD Sports, for which Houlihan Lokey and its affiliates have received compensation, including, among other things, having provided certain strategic consulting services to Finish Line. Houlihan Lokey and certain of its affiliates received aggregate fees for such services from Finish Line and its affiliates of approximately $390,000 in the two years preceding the date of Houlihan Lokey's opinion and aggregate fees for such services from an affiliate of JD Sports of approximately $250,000 during such period.

Proxy Statement at 61.

63.     The Proxy Statement fails, however, to disclose the specific services Houlihan performed for JD Sports.

64.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

65.     The omission of this information renders the statements in the "Opinions of the Finish Line Special Committee's Financial Advisors Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

66.     The Proxy Statement also fails to disclose material information concerning potential conflicts of interest faced by the Company's directors and executive officers.

67.     The March 26, 2018 joint press release announcing the Proposed Transaction quotes Cowgill, Executive Chairman of JD Sports, as stating:

> The acquisition represents an excellent opportunity for JD to establish its market leading multi-brand proposition in the world's largest athleisure market. It immediately offers a major presence in the US, a clear next step to further increase our global scale. Finish Line has many similarities to JD with a strong bricks and mortar offering complemented by an advanced and well-invested digital platform. **We are looking forward to working with Finish Line's experienced management team to bring best in class retail theatre to the US.**

Emphasis added.

68.     Additionally the Proxy Statement sets forth:

> JD Sports and Finish Line have commenced an integration planning process to determine the employment status of Finish Line's executive officers following the effective time of the merger. Additional decisions regarding the employment status of Finish Line's executive officers are expected to be made closer to, or after, the closing of the merger. As a result, at this time the current employment agreements with Mr. Sato, Mr. Wilhelm, Ms. Greenwell, Mr. Hall, and Mr. Sutera are expected to remain in effect unless and until terminated or amended in connection with the integration planning process with JD Sports.

Proxy Statement at 70.  However, the Proxy Statement fails to disclose the details of any employment-related discussions and negotiations that occurred between Finish Line and JD Sports executive officers, including who participated in all such communications, when they occurred, and their content, as well as whether any of JD Sports' prior proposals or indications of interest mentioned management retention or board membership in the combined company.

69.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

70.     The omission of this information renders the statements in the "Background of

the Merger" and "Employment Arrangements Between JD Sports and Finish Line's Executive Officers" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

71.      The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

### Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

72.      Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

73.      During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

74.      By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the financial analyses performed by the Company's financial advisor, the actual intrinsic standalone value of the Company and potential conflicts of interest.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

75.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

76.     By reason of the foregoing, defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

77.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

78.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

79.     The Individual Defendants acted as controlling persons of Finish Line within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Finish Line and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

80.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause

them to be corrected.

81.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly involved in the making of the Proxy Statement.

82.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

83.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

84.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of defendants' conduct, Finish Line's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Finish Line, and against defendants, as

follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Finish Line stockholders;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

DATED: May 18, 2018

/s/Jason A. Shartzer
Jason Shartzer, Attorney No. 23989-49
SHARTZER LAW FIRM, LLC
156 E. Market Street
10th Floor, Suite 1000
Indianapolis, Indiana 46204
Tel: (317) 969-7600
Fax: (317) 969-7650

*Counsel for Plaintiff*

OF COUNSEL:

WEISSLAW LLP
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
racocelli@weisslawllp.com

*Counsel for Plaintiff*